GEISENBERGER & FRIEDLER et al. v. ROBERT YORK & CO. et al.

(Circuit Court of Appeals, Fifth Circuit.   December 20, 1919.)

No. 3364.

1. CORPORATIONS �köm309(5)—PAYMENT OF CORPORATION MORTGAGE DEBT BY CREDITOR, WHO IS DIRECTOR, ENTITLES HIM TO SUBROGATION.

A creditor, who was also a director, who paid a note of a corporation secured by mortgage on land in Louisiana, *held* subrogated to the mortgage lien, under Civ. Code La. art. 2161, providing for such subrogation as of right, although he took an unsecured note for the amount.

2. CORPORATIONS ⊫om309(5)—MORTGAGE TO DIRECTORS VALID.

A mortgage given by a corporation to secure a loan made to it by two directors, as authorized by unanimous vote of the directors present at an annual meeting, *held* not invalid because such two directors voted for the resolution and their presence was necessary to constitute a quorum, where the directors present owned all the stock except one share, and it appeared that the transaction was fair and in good faith, and that the money was needed and used to pay other debts of the corporation.

3. CORPORATIONS ⊫om309(5)—ASSUMPTION OF MORTGAGE IN CORPORATION SUCCEEDING MORTGAGOR VALID.

A mortgage on property of a corporation, made to two of its directors, even though voidable by the corporation, *held* valid as against a corporation succeeding to its assets, which assumed it by unanimous vote of its directors, who were also sole stockholders.

Appeal from the District Court of the United States for the Western District of Louisiana; George W. Jack, Judge.

Suit in equity by Robert York & Co. and others against the Standard Hardwood Company and others. From the decree, Geisenberger & Friedler and others appeal. Affirmed.

The following is the opinion of Jack, District Judge:

On petition of plaintiffs, receivers were appointed for defendant company. Thereafter plaintiffs took a rule on the receivers to show cause why the mill and lands of the company should not be sold to satisfy certain mortgage notes held by the plaintiffs. The defendant company is the successor of the Brevard & Woods Stave Company, which purchased a large tract of land in Concordia parish, La., from the Farmer-Wren Land Company, for the price of $170,000, of which amount a part was paid by exchange of lands in Mississippi, $10,000 in cash, and for the balance four vendor's lien and mortgage notes were given, for $24,212.50 each. Plaintiffs allege themselves to be the owners of the three last maturing of these notes by purchase from the Farmer-Wren Land Company, and in addition they allege themselves the holders and owners of five notes of defendant company, for $20,000 each, aggregating $100,000 secured by a second mortgage on the lands.

Defendant receivers, in answer, admit that the plaintiff owns the two last maturing notes given the Farmer-Wren Land Company for $24,212.50 each, but they allege that the other note of this series was not purchased by plaintiffs but was paid by them, and that plaintiffs merely have an unsecured claim against the defendant for the amount of said note. The receivers while making no denial of the fact that the Yorks loaned the company $100,000 and more, denied the validity and legality of the $100,000 mortgage executed to secure this indebtedness, on the ground that at the meeting of the board of directors, which authorized the mortgage, only four of the five members were present, including the two Yorks, who were interested parties, and therefore they claim could neither vote on the resolution nor be counted to make a quorum.

'It appears that the Brevard & Woods Stave Company was a Tennessee corporation, with a capital stock of $25,000, doing business in Mississippi. In 1907 Brevard, the president, sought .to obtain a loan from J. B. & Robert York of St. Louis, who were engaged in buying and selling lumber. To induce them to make the loan the stockholders of the company sold them one-half of the outstanding stock. For part of this stock they paid par value, and for the remainder $1.25 on the dollar. Later the Yorks obtained one-fourth more of the stock, thus giving them a three-fourths interest. In July, 1914, a large tract of land in Concordia parish, La., was purchased and a hardwood mill thereon erected.

In December, 1915, on request of the stockholders, the board of directors passed a resolution changing the name of the company to the Standard Hardwood Company and increased the capital stock to $100,000. This change in the charter, however, it seems, was never legally perfected, and in January, 1918, after the appointment of the receivers the old board of directors rescinded the action. On January 11, 1916, at the annual meeting of the board of directors, the $100,000 mortgage was authorized. There were present at this meeting the two Yorks, L. E. Brevard, Gates, who was an employé of the Yorks, and Mrs. Brevard, wife of L. E. Brevard. These five constituted the entire board, and likewise were the sole stockholders; the latter two holding each only one share of stock. At this meeting, Robert York offered a resolution authorizing the president to give a second mortgage on the lands to J. B. & Robert York (a commercial partnership) to secure them for moneys advanced and to be advanced before the 1st of February, 1916. The resolution was seconded by J. B. York and unanimously adopted. On January 15, 1916, Brevard, as president, executed to the order of Robert York five notes, each for $20,000, payable in one, two, three, four, and five years, and on May 15th executed the mortgage, and a few days thereafter delivered the notes to J. B. and Robert York.

The company did not prosper. Larger capital was necessary to conduct its business. The Yorks conceived the idea of organizing a new company, with a larger capital stock, and transferring to it the assets of the Stave Company. Accordingly the Yorks and Brevard procured the organization of a Delaware corporation under the name of the Standard Hardwood Company. The three men named in the charter apparently acted merely as a matter of accommodation. They subscribed for only 10 shares of stock, for which they paid nothing, and which they later transferred to the two Yorks and Brevard, who became the sole stockholders and the first board of directors of the new company.

To the Standard Hardwood Company was sold and transferred the Louisiana property of the Brevard & Woods Stave Company. Their only other property at the time was some land in Mississippi worth about $3,000, which was mortgaged to the mother of Brevard for a debt of about that amount. The consideration of the sale was the assumption by the Hardwood Company of the balance due on the mortgage indebtedness of the .Farmer-Wren Land Company, aggregating $72,637.50, the assumption of $100,000 of second mortgage notes given Robert York, the assumption of all accounts due by the Stave Company as of October 2, 1916, incurred by operations in Louisiana, and the issuance to the stockholders of the Brevard & Woods Stave Company of $25,000 of the stock of the Standard Hardwood Company; this being in effect an exchange of stock of the two corporations dollar for dollar. By another resolution the officers were directed to issue and sell to any future subscribers stock up to the full amount authorized by the charter, $100,000, but no stock was sold.

The Standard Hardwood Company took charge of the properties about the middle of October, 1916, and paid all bills of the Stave Company, which had been rendered by creditors. Practically all lumber thereafter manufactured was sold to the Yorks. The mill continued to lose money. Brevard in December, 1916, made a trip away to try to find a purchaser for the property, but was unsuccessful, and a few months thereafter the mill ceased operation. The Yorks resigned and transferred their stock to J. B. Coyle, trustee. Coyle was the bookkeeper of the Hardwood Company. On the resolution of J. B.

York, as president, February 20, 1917, Brevard was elected to succeed him, and on March 10th Coyle was elected a director. At the same meeting a resolution was passed providing that the company take steps to immediately dispose of the assets and liquidate the business.

## The Farmer-Wren Company's Notes.

The Yorks claim to have purchased the three last maturing of the Farmer-Wren notes each for $24,212.50, and as to the last two there is no dispute; but it is contended by the receivers that the first of these three notes, due January 15, 1917, was not purchased by the Yorks, but was actually paid by them, the receivers claiming that Robert York had taken the company's note for $25,000 to cover the amount of the Farmer-Wren note, with interest, and had then paid the latter. Thus they claim the Yorks were the holders of the company's unsecured note, and not the Farmer-Wren mortgage note; in other words, that the Farmer-Wren mortgage note has been extinguished by novation.

It appears that in December, 1916, in anticipation of the maturity of the Farmer-Wren mortgage note, Brevard executed the company's note for $25,-000 to the order of J. B. & Robert York, which he delivered to Robert York, who was then at the mill. Brevard testifies that it was his understanding that the Yorks would accept this note for the loan of the necessary money to pay off the mortgage note and that the latter would thus be paid. Robert York denies that there was any agreement that the Yorks would lend the money, but states that, it having been apparent that the Hardwood Company would not be able to pay the note when due, he had told Brevard it might be advisable for him to take the company's note to Memphis with him, to see what could be done relative to financing payment of the mortgage note due the following month, and that he was then acting in his capacity as vice president of the Hardwood Company; that accordingly the note was made out, and he took it to Memphis, and left it with the bookkeeper of J. B. & Robert York, with the following memorandum attached: "Hold unless we pay B. & W. note to Farmer-Wren Co.    J. B. & R. Y."

The bookkeeper, he states, was instructed not to place the note to the credit of the Hardwood Company until further advised, unless the Yorks borrowed the money in their own name to pay the note. He testifies that he cancelled by perforation the Hardwood Company's signature on the note about the middle of February, 1917. The note, however, was not returned to the company's office at Ashridge, La., until after the appointment of a receiver. The memorandum attached to the note was an instruction to York's bookkeeper, and was in effect to hold the note, making no entry in the books, unless York paid the Farmer-Wren note. York's testimony is that he obtained a few months' extension of the note, and then bought the note from the Farmer-Wren Company, and in this he is corroborated by Farmer. The note itself is indorsed in blank, and not marked "Paid" or "Canceled." No entry was made, either in the Hardwood Company's books or the books of J. B. and Robert York, of the $25,000 note. Whatever may have been the original intention of York as to the payment of the Farmer-Wren note, the weight of the evidence sustains his contention that he did not pay it, but purchased it.

[1] As a matter of fact, however, even had York paid the note and had it canceled, his position would not have been materially affected, for in that event he would have been subrogated to the rights of the Farmer-Wren Company under article 2161 of the Civil Code, which reads: "Subrogation takes place of right: 1. For the benefit of him who, being himself a creditor, pays another creditor, whose claim is preferable to his by reason of his privileges or mortgages." See, also, Walmsley v. Theus, 107 La. 416, 31 South. 869; Zeigler v. His Creditors, 49 La. Ann. 145, 21 South. 666.

## The $100,000 Second Mortgage.

[2] That a corporation may borrow money from and grant a mortgage to one or more of its directors, where the interested directors deal absolutely fairly with the corporation and no advantage is taken, is well settled by both the federal and state jurisprudence. While such contracts will be closely

scrutinized by the courts, they will be sustained where they are in the interest of the company and are fair and equitable. The doctrine is well and succinctly stated in Thompson's Commentaries on Corporations, § 4068, quoted and approved in the case of Villere v. New Orleans Pure Milk Co., 122 La. 717, 48 South. 162: "The strict rule that directors cannot enter into contracts with the corporation does not seem practicable. It would operate to disable those who have already embarked their funds in a corporate enterprise, and given to it their personal attention, from assisting it in time of difficulty, except at the risk of doing so without security. A corporation might be in a sorry plight, indeed, if one who had already embarked his funds in it, and who, from the fact of his being one of its managers, is best acquainted with its needs and difficulties, should not be able to make a present advance of money to help it out of those difficulties."

In Thompson on Corporations (2d Ed.) vol. 2, par. 1227, it is said: "The American courts, with some exceptions already noted, take perhaps the more practical view that contracts entered into by directors with themselves as individuals are not per se void, but are merely voidable at the option of the corporation or of the stockholders, provided the disaffirmance is exercised within a reasonable time, all the circumstances of the case considered." See large number of authorities cited, state and federal.

And again, in paragraph 1256, Thompson says: "The rule granting relief to the corporation and stockholders where a director makes a contract with himself, or where he secures some advantage or profit, is not to be used to the injury of the director, where such contract is free from actual fraud. The rule was adopted for the purpose of securing justice, and not to work injustice. In attempting to prevent a wrong, it is not the intention of the law to substitute one wrong for another. Hence, certain limitations have been placed upon the operation of the rule, intended to guard against evil consequences as inequitable as those it was designed to prevent."

In the case of Sanford Tool Co. v. Howe, Brown & Co., 157 U. S. 312, 15 Sup. Ct. 621, 39 L. Ed. 713, the court upheld a mortgage given by the directors to themselves to secure them for indorsements made and to be made on the company's paper, holding that, although a corporation at the time of such mortgage might not then be possessed of assets at cash prices sufficient to cover its indebtedness, if it were in fact a going concern and expected to continue business, the mortgage would be upheld.

It is contended, however, by counsel for the receivers, that, while a mortgage may be given to a director to secure a loan, it must be first authorized by a vote of the board of directors at which a quorum was present exclusive of interested directors, and a majority of such voted for the resolution. They take the position that in the case at bar, only four of the five directors having been present, including the two Yorks, that the action of the board was absolutely void. This contention leads to the conclusion that, while one member of the board of directors might come to the corporation's relief by making it a loan and taking as security a mortgage, the entire board could not join in such a loan, because in that event there would be no disinterested directors whatever, much less a quorum, to authorize the contract.

This contention I do not think sound. Whether the loan be made by one or all of the directors, and the mortgage given to one or all of them, it is subject to the same rule. It is not absolutely void, but voidable, and will be closely scrutinized by the court, and if there be any fraud or advantage taken, or if it be not to the interest of the corporation, the courts will not enforce it. In the Sanford Tool Co. Case, just cited, the mortgage was made in favor of all five of the individuals composing the board of directors, who as directors authorized the mortgage to themselves.

In the case of Leavenworth County v. Railroad Co., 134 U. S. 688, 10 Sup. Ct. 708, 33 L. Ed. 1064, which was a suit to annul a mortgage, or deed of trust, from the Southwestern Co. to the Rock Island Co., the court said: "I am unable to see anything in the fact that some of the same men were found to be trustees in this deed and directors in the Rock Island Company, and that directors in the Southwestern Company were also directors in the Rock Island Company, which should block the course of justice, paralyze the power

of the court, and deprive the creditor corporation of all remedy for the enforcement of its lien." The court then proceeded to hold that the corporation and its directors had the right to enter into contracts between themselves, and the question was not: Could they do these things: but have the relations of the parties—trust relations, if, indeed, such existed—been abused to the serious injury of the company?

And so in my opinion, in the case at bar, the question is not whether the corporation could enter into the contract with the Yorks, even though it were necessary for them to participate in the directors' meeting in order to have a quorum, but whether the trust relations of the Yorks to the corporation were abused to the injury of the corporation, or its creditors. It is not disputed that the Stave Company received the $100,000 and more from the Yorks. At the time the mortgage was authorized Brevard testifies $89,000 of the amount had already been advanced and $11,000 more was put up with which was paid off other creditors. Brevard's mother, it appears, had a claim for $3,000, which was taken care of by a mortgage on other property. All other creditors not secured by mortgage were paid the accounts rendered, though there may have been due some of the mercantile creditors small amounts for the current month. Thus there was left only the indebtedness due the Farmer-Wren Land Company, the Yorks, and Mrs. Brevard. This mortgage on the property was granted while the company was a going concern, and over a year and a half prior to the application for the receivership.

Clearly, had the $100,000 been loaned by a third party, no objection whatever could have been made to giving him a mortgage, and, the transaction being free from fraud, or unfair advantage. there is no good reason why these directors, who came to the aid of the corporation, should not be given the benefit of their mortgage. That there was not a quorum of disinterested directors at the meeting authorizing the mortgage was due to the fact of the absence of Mrs. Brevard, wife of the president of the company, who held only one share of stock, which she did not pay for, and which was placed in her name merely as a matter of convenience to make her eligible as a director. It would. no doubt, have been the better course to have had her present, in which event it would not have been necessary for the Yorks to have participated in the meeting; but as the contract was not unfair, but, on the contrary, for the benefit of the corporation, enabling it to settle all of its indebtedness on open accounts and continue its business, the mere fact that the Yorks voted for the resolution would not be sufficient cause to annul the mortgage.

[3] The Standard Hardwood Company, as I have before stated, was but a reorganization of the original Stave Company. Its sole stockholders and directors were the two Yorks and Brevard. The three, both at a stockholders' meeting and at a directors' meeting, authorized the assumption of this $100,000 mortgage as a part of the consideration for the transfer of the Stave Company to the Hardwood Company of the Louisiana lands. Thus the original action of the board of directors of the Stave Company, which was voidable, was ratified by the unanimous vote of all of the directors and the stockholders of the reorganized company. True it is that the majority of the directors of the reorganized corporation were still interested; but they, with Brevard, constituted the sole directors and the sole stockholders, and certainly by their unanimous vote the former action of the directors might be ratified.

In Thompson on Corporations, vol. 2, par. 1257, it is said: "The contracts made by directors with themselves, are in some cases said to be void; but this word is used in the sense of voidable. The correct principle is that, unless such transactions and contracts fall within the prohibition of the statute, or of a rule of the common law, it is voidable either at the election of the corporation acting through its directors, or at the election of stockholders." See Hoyle v. Plattsburg R. R. Co., 54 N. Y. 314, 13 Am. Dec. 595; Buell v. Buckingham. 16 Iowa. 284, 85 Am. Dec. 516; Chouteau v. Allen, 70 Mo. 290; Nye v. Storer, 168 Mass. 53, 46 N. E. 402.

Acts of a minority of the directors, while void, may be ratified by the direct and express action of a duly assembled quorum. In re Portuguese Con-

solidated Mining Co., 45 Ch. Div. 16; Ashley Wire Co. v. Ill. Steel Co., 164 Ill. 149, 45 N. E. 410, 56 Am. St. Rep. 187. The evidence fails to disclose any unfair advantage taken by the Yorks of their position in the company. They continued to advance money to the corporation until it owed them about $89,000 on open account, and they then took the mortgage to cover this and about $11,000 more, which they advanced to pay off the other creditors. Had the corporation then gone out of business, no one would have lost anything. The mortgage, then, at the time it was given, was not prejudicial either to the company or to its creditors, but the company continued in business, and thereafter lost more money. It m'ay be that the Yorks, after taking the mortgage on all of the company's business, about equal, with the prior mortgage, to its full value, should not have permitted the company to continue business at the risk of future creditors, when they themselves had been made secure. But that is a matter for the Legislature and not for the courts. Better business judgment might have prompted a liquidation of the company's affairs at the time of the mortgage; but the evidence does not disclose that the corporation was in such a straitened financial condition as would make it evident to its directors that its continued operation necessarily meant_further loss.

For the reasons stated, I am of the opinion that the three first mortgage notes, of $24,212.50 each, and the five second mortgage notes, for $20,000 each, held by J. B. and Robert York, are valid obligations of the corporation, and that the property mortgaged should be sold by special master to pay the debts of the company, and by preference such mortgage indebtedness; plaintiffs at such sale to have the right, in event they bid in the property, to pay 90 per cent. of their bid in mortgage notes held by them, the remainder to be paid in cash. Fees of attorneys will be fixed later.

A decree in accordance with the views herein expressed will be prepared and entered.

L. T. Kennedy, of Natchez, Miss., for appellants.

John C. Theus, of Monroe, La., for appellees.

Before WALKER, Circuit Judge, and FOSTER and GRUBB, District Judges.

PER CURIAM. We concur in the conclusions reached by the court below in this case, and in the reasons in support thereof stated in the opinion rendered by the District Judge. This being so, discussion by us of the questions presented is deemed to be unnecessary and superfluous.

The decree is affirmed.